THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| C.J. and F.R.,<br><br>                    Plaintiffs,<br><br>   v.<br><br>UNITED HEALTHCARE INSURANCE COMPANY, UNITED BEHAVIORAL HEALTH, CIGNA HEALTH and LIFE INSURANCE COMPANY, CIGNA BEHAVIORAL HEALTH, and the PITTSBURGH FOUNDATION BENEFITS PLAN,<br><br>                    Defendants. | **MEMORANDUM DECISION AND ORDER DENYING DEFENDANTS' [65, 66] MOTIONS FOR SUMMARY JUDGMENT AND GRANTING IN PART PLAINTIFFS' [67] MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:22-cv-00092<br><br>District Judge David Barlow<br><br>Magistrate Judge Cecilia M. Romero |

Before the court are the parties'[1] cross-motions for summary judgment.[2] Plaintiffs C.J. and F.R. (collectively "Plaintiffs") sued Defendants Cigna Health and Life Insurance Company, Cigna Behavioral Health (collectively "Cigna"), and the Pittsburgh Foundation Benefits Plan ("the Plan") under the Employee Retirement Income Security Act of 1974 ("ERISA") and the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA").[3] For the reasons below, the court grants in part Plaintiffs' motion and denies Defendants' motions.

---

[1] On December 12, 2023, Plaintiffs voluntarily stipulated to dismiss Defendants United Healthcare Insurance Company and United Behavioral Health with prejudice. ECF No. 57.

[2] Cigna's Mot. Summ. J., ECF No. 65, filed February 5, 2024; Pittsburgh Foundation's Mot. Summ. J., ECF No. 66, February 5, 2024; Pls.' Mot. Summ. J. ("Pls.' MSJ"), ECF No. 67, filed February 5, 2024. Pittsburgh Foundation's motion for summary judgment "is based entirely on the arguments presented by Cigna in its motion for summary judgment" and incorporates by reference all of Cigna's arguments. ECF No. 66. Therefore, the court cites solely to Cigna's motion, ECF No. 65, which it refers to as "Defs.' MSJ."

[3] Compl., ECF No. 2, filed February 14, 2022.

# BACKGROUND

## *Plan Structure, Coverage, and Level of Care Guidelines*

Plaintiff C.J. participated in an employee welfare group health insurance plan ("the Plan") governed by ERISA.[4] As a dependent of C.J.,[5] F.R. was a beneficiary under the Plan.[6] Cigna is the Claims Administrator for the Plan, which "delegates to Cigna the discretionary authority to interpret and apply Plan terms and to make factual determinations in connection with its review of claims under the Plan."[7]

The Plan covers treatment for varying levels of outpatient and inpatient mental health-related services.[8] Outpatient care is the least restrictive and applies when the beneficiary is not confined in a hospital.[9] Outpatient care includes partial hospitalization services, which provides services for "not less than 4 hours and not more than 12 hours in any 24-hour period by a certified/licensed mental health program," as well as intensive outpatient programs ("IOP"), which provides "a combination of individual, family and/or group therapy in a day, totaling 9 or more hours in a week."[10] On the other hand, inpatient mental health treatment is the most restrictive and covers services that are provided by a hospital when a beneficiary is confined in a hospital for treatment and evaluation of mental health.[11] Inpatient care includes Residential Treatment Services, which are provided by a hospital for the evaluation and treatment of

---

[4] Administrative Record ("AR") 4133, ECF No. 64.
[5] C.J. is F.R.'s mother.
[6] Compl. ¶ 6.
[7] AR 4133.
[8] AR 4153.
[9] *Id.*
[10] *Id.*
[11] *Id.*

psychological and social functional disturbances that are a result of subacute mental health conditions.[12]

The Plan defines a Mental Health Residential Treatment Center ("RTC") as an institution which:

> specializes in the treatment of psychological and social disturbances that are a result of mental health conditions; provides a subacute, structured, psychotherapeutic treatment program, under doctor supervision; provides 24-hour care, in which a person lives in an open setting; and is licensed in accordance with the laws of the appropriate legally authorized agency as a residential treatment center.[13]

Under the Plan, benefits are covered if Cigna determines them to be Medically Necessary. The Plan defines Medically Necessary as:

> Healthcare services, supplies and medications provided for the purpose of preventing, evaluating, diagnosing or treating an Illness, Injury, condition, disease or its symptoms, that are all of the following as determined by a Medical Director or Review Organization:
> - required to diagnose or treat an Illness, Injury disease or its symptoms; and
> - in accordance with generally accepted standards of medical practice; and
> - clinically appropriate in terms of type, frequency, extent, site and duration; and
> - not primarily for the convenience of the patient, Doctor or health care provider; and
> - rendered in the least intensive setting that is appropriate for the delivery of the services, supplies or medications. Where applicable, the Medical Director or Review Organization may compare the cost-effectiveness of alternative services, supplies, medications or settings when determining the least intensive setting.[14]

To evaluate coverage of RTC level of treatment for children and adolescents, Cigna uses the Cigna Standards and Guidelines/Medical Necessity Criteria for Residential Mental Health

---

[12] *Id.*
[13] *Id.*
[14] AR 4182.

Treatment for Children and Adolescents ("Residential Treatment Guidelines"). Under these

guidelines, all of the following must be met for admission to an RTC:

1. All elements of Medical Necessity must be met.
2. The child/adolescent has been diagnosed with a moderate-to-severe mental health disorder, per the most recent version of the Diagnostic and Statistical Manual of Mental Disorders and evidence of significant distress/impairment.
3. This impairment in function is seen across multiple settings such as: school, home, work, and in the community, and clearly demonstrates the need for 24 hour psychiatric and nursing monitoring and intervention.
4. As a result of the interventions provided at this level of care, the symptoms and/or behaviors that led to the admission can be reasonably expected to show improvement such that the individual will be capable of returning to the community and to a less restrictive level of care.
5. The child/adolescent is able to function with age-appropriate independence, participate in structured activities in a group environment, and both the individual and family are willing to commit to active regular treatment participation.
6. There is evidence that a less restrictive or intensive level of care is not likely to provide safe and effective treatment.[15]

Cigna's Residential Treatment Guidelines further specify that, in order for continued

RTC stay to be covered under the Plan, the child receiving treatment must "continue to meet all

elements of Medical Necessity."[16] Additionally, all of the following must be met: "(A) The

child/adolescent and family are involved to the best of their ability in the treatment and discharge

planning process; (B) Continued stay is not primarily for the purpose of providing a safe and

structured environment; and (C) Continued stay is not primarily due to a lack of external

supports."[17] Lastly, one or more of the following criteria must be met:

A. The treatment provided is leading to measurable clinical improvements in the moderate-to-severe symptoms and/or behaviors that led to this admission and a progression toward discharge from the present level of

---

[15] AR 4226.
[16] AR 4227.
[17] *Id.*

      care, but the individual is not sufficiently stabilized so that he/she can be safely and effectively treated at a less restrictive level of care,

B. If the treatment plan implemented is not leading to measurable clinical improvements the moderate-to-severe symptoms and/or behaviors that led to this admission and a progression toward discharge from the present level of care, there must be ongoing reassessment and modifications to the treatment plan that address specific barriers to achieving improvement, when clinically indicated,

C. The individual has developed new symptoms and/or behaviors that require this intensity of service for safe and effective treatment.[18]

If a beneficiary disagrees with an initial coverage determination, the Plan provides an internal appeal process.[19] If the beneficiary's claim is again denied, the beneficiary may either appeal through an external review program or bring legal action.[20]

*Pertinent Medical History*

F.R.'s mental health struggles began in 2009 when she was five or six years old.[21] That year, her father attempted suicide and her parents separated a few months later.[22] To deal with this trauma, F.R. began receiving art therapy and general therapy treatments with Ursula Schwartz, Ph.D. on and off until 2016 when F.R. was in 7th grade.[23] In 2016, F.R. became increasingly concerned with her appearance and developed the irrational belief that her face was asymmetrical.[24] This belief became so consuming that F.R. began refusing to leave the house.[25]

---

[18] AR 4227.

[19] AR 4120.

[20] AR 3519.

[21] AR 81, 140. Defendants dispute how Plaintiffs "selectively cite F.R.'s medical history" and "do not cite to any contemporaneous medical records" prior to F.R.'s admission to Solacium New Haven (an RTC) on February 15, 2019. Defs.' MSJ. at 5. The court does not base its coverage decision on these pre-2021 events, but instead includes these facts as useful background and because they were supplied to and considered by Cigna in Plaintiffs' first-level appeal of Cigna's denial letter. *See* AR 3516–17 (stating that Cigna's reviewer reviewed the appeal).

[22] AR 81.

[23] *Id.*

[24] *Id.*

[25] *Id.*

On April 9, 2016, C.J. took F.R. to the hair salon for a haircut that F.R. wanted.[26] During the haircut, she had a panic attack—characterized by a tearful outburst, shortness of breath, and dizziness—which resulted in C.J. taking F.R. to a local psychiatric hospital for an evaluation.[27] She was then taken to University of Pittsburgh Medical Center ("UPMC"), where the evaluator noted that F.R. was depressed, anxious, had not been going to school due to poor self-esteem, had suicidal thoughts with no plan or intent, experienced a lack of appetite, and was not sleeping.[28]

From September 6 to November 10, 2016, F.R. had her first round of Obsessive-Compulsive Disorder ("OCD") intensive outpatient ("IOP") treatments with an intense focus on exposure response prevention to help her overcome her body dysmorphic disorder.[29] At this point, she was discharged, returned to school, and began seeing several therapists and psychiatrists at UPMC's Family and Children's Center.[30]

To help manage her depression, F.R. enrolled in a partial hospitalization program ("PHP").[31] However, according to C.J., instead of her treatment helping her, F.R. began to express increasing suicidal ideation and anxiety.[32] F.R. withdrew from the PHP and re-enrolled in the OCD IOP from September 19 to October 16, 2017,[33] but her suicidal ideation and self-harm behaviors increased alarmingly.[34] As a result, her therapists recommended that she enroll in

---

[26] *Id.*
[27] *Id.*, AR 138.
[28] AR 138.
[29] AR 82.
[30] *Id.*
[31] *Id.*
[32] AR 82.
[33] AR 270–71.
[34] AR 82–83.

the Suicidal Teens at Risk (STAR) Program for intensive therapy from October to November 2017.[35] On November 9, 2017, F.R. was discovered to be engaging in acts of self-harm, including making three to six-inch knife cuts on her calves and shins, which resulted in her first hospitalization for six days.[36]

From November 2017 to November 2018, F.R. received treatment at the Children and Adult Bipolar Spectrum Disorder Clinic.[37] In addition, from December 2017 to July 2018, C.J. and F.R. participated in family-based therapy, which included two to three home visits per week for eight weeks.[38] In the fall of 2018, F.R. transitioned to receiving weekly therapy from Amy Schlonski, a licensed clinical social worker and Board Certified Diplomate in Clinical Social Work.[39] According to C.J., F.R.'s condition did not substantially improve.[40] During this period, F.R.'s anger increased significantly, including screaming and becoming physical with C.J. when asked to do ordinary tasks like homework, chores, and going to school.[41] F.R. would bang her head on the wall, furniture, and floor, lunge for objects with which to harm herself, and threaten to run away.[42] She also stopped going to school on a regular basis.[43] Ms. Schlonski broached the idea of enrolling F.R. in a residential treatment program because she was not responding to the current treatment.[44]

---

[35] AR 83, 387.
[36] *Id.*, AR 373–80, 387, 83.
[37] AR 83.
[38] *Id.*
[39] *Id.*
[40] *Id.*
[41] AR 84.
[42] *Id.*
[43] *Id.*
[44] *Id.*

*Admission to New Haven*

On November 23, 2018, F.R.'s father committed suicide.[45] After her father's death, F.R. became more suicidal and depressed.[46] Although her mother locked up all sharp objects, she began finding F.R. hiding sharp objects in her room.[47] From January 7, 2019 to January 18, 2019, F.R. re-enrolled in the STAR IOP program.[48] On January 20, 2019, C.J. discovered that F.R. was texting friends about her plans to hang herself in the closet (the same way her father died).[49] C.J. took F.R. to the hospital where she stayed from January 20, 2019 to January 29, 2019.[50]

On February 15, 2019, F.R. was admitted to Solacium New Haven ("New Haven"),[51] an RTC.[52] At New Haven, therapist Andrew Hines listed three diagnoses in the Master Treatment Plan: Major Depressive Disorder, Obsessive-Compulsive Disorder, and Generalized Anxiety Disorder.[53] First, he described her anxiety that most noticeably included perfectionist thoughts, such as putting herself down over not doing things in a precise manner and only seeing the negative side of a situation.[54] Second, he described F.R.'s difficulty regulating her emotions as a

---

[45] *Id.*

[46] *Id.*

[47] *Id.*

[48] AR 84–85.

[49] AR 85.

[50] *Id.*, 524

[51] AR 907, 910, 912.

[52] Cigna summarily states in its opposition to Plaintiffs' facts that New Haven is not an RTC. Defs.' MSJ 4. Cigna devotes only a single sentence to this assertion, which does not appear in its argument section. As Cigna does not include this reason in any of its denial letters, this unsupported contention is not relevant. The court also notes that New Haven's website's homepage states "We are a residential treatment center . . . " *New Haven*, https://www.newhavenrtc.com/ [https://perma.cc/5JK9-RX5H] (last visited Sept. 17, 2024); *see also Labertew v. WinRed, Inc.*, No. 2:21-CV-555-TC, 2022 WL 1568924, at *7 (D. Utah May 18, 2022) ("Courts have taken judicial notice of information posted on websites."); *Joseph F. v. Sinclair Servs. Co.*, 158 F. Supp. 3d 1239, 1245 (D. Utah 2016) (identifying New Haven as "a licensed residential treatment facility.").

[53] AR 3242, 3265.

[54] AR 3243.

direct cause of anxiety and obsessions.[55] Third, Mr. Hines described F.R.'s obsessions and compulsions as part of her OCD diagnosis, such as obsessing over doing something perfectly, fretting that nothing is ever good enough, and believing most of the things she does impact other people in a negative way.[56]

*Care at New Haven*

F.R. remained at New Haven from February 15, 2019 to January 24, 2020.[57] The recommended treatment care included weekly individual therapy, weekly family therapy, daily group participation, full participation in the values program, active participation in recreational therapy, therapeutic assignments, family weekends and therapeutic home passes, a monthly meeting with the consulting psychiatrist to evaluate anxiety and medication, various forms of residential support, experiential support, meeting with an academic advisor, and assessing and treating any incidents of self-harm.[58] The master treatment plan also included a number of objectives, such as learning skills to cope and manage her symptoms, identifying and exploring patterns in her mood, and completing a minimum of three successful home passes.[59]

New Haven provided treatment summaries throughout F.R.'s time there.[60] In June 2019, F.R.'s treatment summary indicated that she wrote a "concerning" letter to her mother "regarding mood/anxiety symptoms a week prior to her period including [suicidal ideation]."[61] On June 26, 2019, Mr. Hines, F.R.'s therapist, observed that F.R. continues to report on "high levels of

---

[55] *Id.*
[56] AR 3244.
[57] AR 912, 3555.
[58] AR 3242–46.
[59] *Id.*
[60] AR 3535–37.
[61] AR 3536.

anxiety constantly, obsessive thoughts about inadequacy and body image, [and] constant worry about school failure" and these "symptoms and behaviors demonstrat[e] the continued need for RTC level of care."[62] On July 3, 2019, directly after a home pass for F.R.'s mother's wedding, F.R.'s therapist repeated the concerns from the June 26, 2019 session, including that F.R.'s "symptoms and behaviors demonstrat[e] the continued need for RTC level of care.[63] Although the specific symptoms varied over time, F.R.'s therapist noted that F.R.'s "symptoms and behaviors demonstrat[e] the continued need for RTC level of care" on multiple dates in July 2019,[64] August 2019,[65] September 2019,[66] October 2019,[67] and November 2019,[68] In this July 3, 2019 therapy session, however, Mr. Hines also noted that "[F.R.] used the skills she learned the previous sessions to be able to come home in a good mood and continue with her routine at the home and in school."[69]

Also on July 3, 2019, F.R. filled out a self-questionnaire that involved reading statements and describing how true the statement was during the prior seven days.[70] F.R. had to choose between checking "Never or Almost Never," "Rarely," "Sometimes," "Frequently," and "Almost Always or Always."[71] The results of the questionnaire were somewhat mixed.[72] For example, F.R. reported "frequently": (i) feeling anxious or nervous;[73] (ii) having strong and quickly

---

[62] AR 1576.
[63] AR 4018.
[64] AR 3341, 3348, 3980.
[65] AR 2950, 3353.
[66] AR 2735, 2786, 2839, 2919, 3355.
[67] AR 2552, 2621, 2649.
[68] AR 3367, 3371.
[69] *Id.*
[70] AR 4020.
[71] AR 4020–35.
[72] The court notes that the answers in this questionnaire may be partially affected by F.R. having just returned from a home trip celebrating her mother's wedding. *See* AR 3343.
[73] AR 4023.

changing emotions;[74] (iii) pouting, crying, or feeling sorry for herself more than others her age;[75]

(iv) feeling irritated;[76] (v) getting down on herself and blames herself for things that go wrong;[77]

and (vi) getting frustrated or easily upset and giving up.[78] She also reported "Almost Always or

Always" feeling guilty when she does something wrong[79] and not forgiving herself for things she

has done wrong.[80] In addition, when asked how often she had been bothered by the following

problems in the past two weeks, F.R. responded that on "Several days" she felt "down,

depressed, or hopeless," felt bad about herself—or that she was a failure or let herself or her

family down.[81]

     In contrast, in the same self-questionnaire, F.R. responded "Never or Almost Never" in

response to whether she cut classes or skips school;[82] had physical fights with adults, family, or

others her age;[83] steals or lies;[84] sees, hears or believes things that are not real;[85] has hurt herself

on purpose;[86] uses alcohol or drugs;[87] breaks rules, laws or doesn't meet others' expectations on

purpose;[88] or thinks about suicide or feels she would be better off dead.[89] She also responded that

she "Rarely" argues or speaks rudely to others[90] or is sad or unhappy.[91] In addition, when asked

---

[74] AR 4027.
[75] AR 4028.
[76] AR 4031–32.
[77] AR 4033.
[78] AR 4035.
[79] AR 4031.
[80] AR 4034.
[81] AR 4036–37.
[82] AR 4021.
[83] AR 4022, 4024.
[84] AR 4023.
[85] AR 4025.
[86] *Id.*
[87] *Id.*
[88] AR 4027.
[89] AR 4030.
[90] AR 4021.
[91] AR 4026.

how often she had been bothered by the following problems in the past two weeks, F.R. responded "Not at all" with respect to having little interest or pleasure in doing things or having thoughts that she would be better off dead or of hurting herself.[92]

On July 6, 2019, F.R.'s residential progress note stated that F.R. "seemed to be depressed during the shift today. [F.R.] seemed to isolate herself and spent a lot of time alone during the shift."[93] On July 9, 2019, F.R.'s individual therapy notes stated that F.R. "is showing great positivity and self esteem right now . . . [and] returned from her home pass in high spirits and adjusted quickly to being back. She said that she realized that she'd be able to see her mom more frequently, and be home even more, so she's lost a lot of anxiety she had that has been holding her back."[94] The same individual therapy notes stated that F.R. "continues to report on the following symptoms and behaviors demonstrating the continued need for RTC level of care."[95]

On July 12, 2019, F.R.'s treatment summary noted that she is "[m]aking great progress therapeutically," is motivated, but also that her mother was concerned about bruising.[96] On July 18, 2019, the treatment summary indicated that F.R.'s relationships with family are improving and that her mood has been improving over the past several months, although F.R. notices each month approximately five days of worsening mood during "beginning of her menses which is consistent monthly."[97]

On August 1, 2019, the treatment summary indicated that F.R. suffered from body image issues leading to some restriction, as well as irritability with peers and decreased motivation and

---

[92] AR 4036–37.
[93] AR 3339.
[94] AR 3980.
[95] *Id.*
[96] AR 3536.
[97] *Id.*

hopelessness.[98] F.R. also denied suicidal ideation or self-harm ideation and indicated that

intrusive thoughts were "not really" present.[99] On September 6, 2019, the treatment summary

stated that F.R.'s "OCD themes [were] changing (body image)," "some restricting recently"

positive staff notes (generally), irritable, performing well in school, "bursts" of motivation, and

no suicidal ideation now but "occasional bursts" without intent or plan.[100]

On October 11, 2019, the treatment summary stated that F.R. had been working well with

peers despite some "chaos in the house," "F.R. was motivated in program," and that she was

"overall doing well."[101] It also indicated that F.R.'s transition/discharge would likely occur in

December.[102] On November 13, 2019, the treatment summary stated that F.R. had just returned

from her longest home pass and "there were some issues that arose," she had been feeling "sick"

for the past few weeks, suffered from some "anxiety moments" associated with feeling

physically "sick," and that F.R. "might not discharge until January" instead of December.[103] On

December 13, 2019, the treatment summary referenced positive staff notes, some "social

anxiety," and some "anticipatory anxiety."[104] On January 24, 2020, F.R. was discharged from

New Haven.[105]

---

[98] *Id.*
[99] *Id.*
[100] *Id.*
[101] *Id.*
[102] *Id.*
[103] *Id.*
[104] AR 3537.
[105] AR 3537, 3555.

*First Denial of Benefits*

The court now turns to F.R.'s claims processing interactions with Cigna, who acted as the claims administrator as of July 1, 2019.[106] In a letter dated August 2, 2019, Cigna denied payment for F.R.'s treatment from July 1, 2019 to January 1, 2020.[107] The letter stated that Cigna[108] received a coverage request for F.R.'s stay at New Haven on July 17, 2019 and "Based upon the available clinical information, your symptoms did not meet [] Behavioral Health Medical Necessity Criteria for continued stay at Residential Mental Health Treatment for Children and Adolescents level of care from 07/01/2019 - 01/01/2020."[109] In explaining the rationale for the decision, the letter stated the following:

> There was no current risk of harm to yourself or others. You did not demonstrate a need for 24 hour/day monitoring and active treatment. Your family is involved in treatment. From the available clinical evidence, you could receive psychiatric treatment in a less restrictive setting. Less restrictive levels of care were available.[110]

*C.J. Appeals Cigna's Denial of Coverage from July 1, 2019 Forward*[111]

On January 16, 2020, F.R.'s mother, C.J., submitted a level one appeal of the August 2, 2019 decision.[112] She argued that Cigna wrongly concluded that F.R.'s treatment at New Haven was not medically necessary.[113] In doing so, she points to F.R.'s diagnoses of Major Depressive Disorder, OCD, and Generalized Anxiety Disorder; a history of cutting herself and suicidal

---

[106] From February 15, 2019 to June 30, 2019, F.R.'s Plan was administered by United, who is no longer a Defendant. Compl. ¶ 6; ECF No. 57. Thus, only the period beginning July 1, 2019 is at issue.
[107] AR 4119–21.
[108] The review was performed by Cigna's Peer Reviewer, Mohsin Qayyum, M.D., a board-certified psychiatrist. AR 4119.
[109] *Id.*
[110] *Id.*
[111] C.J. clarified that F.R.'s coverage should last until her future discharge date instead of January 1, 2020. AR 80.
[112] AR 77–3515.
[113] AR 78.

ideation, especially following her dad's suicide in November 2018; and that none of F.R.'s extensive past treatments have resolved her issues.[114] The appeal also contained extensive medical documentation from hospitals, doctors, teachers, and therapists to support her arguments.[115] Included among this documentation was, *inter alia*, New Haven's medical records from February 15, 2019 to January 8, 2020,[116] discussed *supra*, and three letters of medical necessity from Danella Hafeman, M.D., dated April 30, 2019; Marian Allen, RN, MSN, dated May 7, 2019; and Lisa DeCarolis, LSW and Valerie Watson, dated May 22, 2019.[117]

In addition to the medical necessity argument, C.J. claimed that Cigna misunderstood the level of care and type of treatment that RTCs render.[118] In support, she cited Cigna's Residential Treatment Guidelines and argued that because they do not include any requirement that F.R. be a "current risk of harm to [her]self or others," the denial rationale does not correlate with the guidelines and instead, is more appropriate for acute inpatient services.[119]

Finally, C.J. contended that Cigna violated the Parity Act because unlike for mental health services, "Cigna has not developed any clinical guidelines for reviewing skilled nursing facility or subacute rehabilitation facility services" and therefore "appears to impose a[] [non-quantitative treatment limitation] that only applies to behavioral health treatment."[120]

---

[114] AR 80–85.
[115] AR 137–3372.
[116] AR 910–3372.
[117] AR 903–09.
[118] AR 78.
[119] AR 109.
[120] AR 116.

*Second Denial of Benefits*

In a letter dated February 10, 2020, Cigna[121] upheld its original decision to deny coverage

of F.R.'s stay at New Haven.[122] The denial letter stated that:

> Based upon the available clinical information received initially and with this
> appeal, your symptoms did not meet Behavioral Health Medical Necessity
> Criteria for continued stay at the Residential Mental Health Treatment for
> Children and Adolescents level of care from 07/01/2019-07/01/2020 as the
> treatment provided has led to sufficient improvement in the moderate to severe
> symptoms and/or behaviors that led to this admission so that you could be safely
> and effectively treated at a less restrictive level of care. The clinical information
> described the individual as being in behavioral control, presenting with a stable
> mood, actively engaging in programming and cooperative. The individual went on
> home passes and demonstrated their ability to maintain safety in this outpatient
> setting on multiple occasions. The clinical information provided indicated that the
> individual had not developed new symptoms and/or behaviors that required this
> intensity of service for safe and effective treatment. Less restrictive levels of care
> were available for safe and effective treatment.[123]

*Procedural Posture*

Plaintiffs filed their Complaint on February 14, 2022.[124] Cigna and the Plan filed their

Answers on May 31, 2022 and June 6, 2022, respectively.[125] In February 2024, the parties filed

cross Motions for Summary Judgment, which were fully briefed on April 29, 2024.[126]

## STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment must be granted "if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled

---

[121] The decision was made by Russell Sheffer, MD, a board-certified psychiatrist. AR 3517.
[122] AR 3516–18.
[123] AR 3517.
[124] Compl., ECF No. 2.
[125] ECF Nos. 18, 22.
[126] Defs.' MSJ; Pls.' MSJ; Defs.' Reply in Further Supp. of Their MSJ ("Defs.' MSJ Reply"), ECF No. 83, filed on April 29, 2024; Pls.' Reply in Further Supp. of Their MSJ ("Pls. MSJ Reply"), ECF No. 82, filed on April 29, 2024.

to judgment as a matter of law."[127] "Where, as here, the parties in an ERISA case both moved for summary judgment . . . , summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor."[128]

## DISCUSSION

The parties move for summary judgment on Plaintiffs' two claims: Cigna's denial of benefits and an alleged MHPAEA violation. The court considers each in turn.

## I.    Denial of Benefits Claim

ERISA "sets minimum standards for employer-sponsored health plans[.]"[129] Congress enacted the regulations "to promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits."[130] For this reason, "ERISA represents a careful balancing between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans."[131] The court first addresses the proper standard of review.

### A.    Standard of Review

Under 29 U.S.C. § 1132(a)(1)(b), a civil action may be brought by an insurance plan participant to recover benefits under the terms of the plan. The Supreme Court has held that "a denial of benefits challenged under [ERISA] must be reviewed under a *de novo* standard unless

---

[127] Fed. R. Civ. P. 56(a).
[128] *Carlile v. Reliance Standard Life Ins.*, 988 F.3d 1217, 1221 (10th Cir. 2021) (cleaned up) (quoting *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010)).
[129] *D.K. v. United Behav. Health*, 67 F.4th 1224, 1236 (10th Cir. 2023).
[130] *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 830 (2003) (citation omitted).
[131] *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1145 (10th Cir. 2023) (internal quotation marks omitted) (quoting *Conkright v. Frommert*, 559 U.S. 506, 517 (2010)).

the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[132]

Where the plan administrator has discretionary authority, courts "employ a deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious."[133] Defendants carry the burden to demonstrate that the arbitrary and capricious standard applies.[134] Courts will uphold the administrator's determination "so long as it was made on a reasoned basis and supported by substantial evidence."[135] "Substantial evidence requires more than a scintilla but less than a preponderance."[136] Substantial evidence is "'such evidence that a reasonable mind might accept as adequate to support a conclusion reached by the decision-maker.'"[137]

"In determining whether the evidence in support of the administrator's decision is substantial, [courts] must take into account whatever in the record fairly detracts from its weight."[138] Plan administrators may not arbitrarily refuse to engage with a claimant's reliable evidence—including the opinions of a treating physician.[139] However, "a benefits decision can be reasonable even when the insurer receives evidence contrary to the evidence it relies upon."[140] For example, where an administrator "credits reliable evidence that conflicts with a treating physician's evaluation," courts may not require that plan administrators provide an explanation

---

[132] *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Foster v. PPG, Inc.*, 683 F.3d 1223, 1231 (10th Cir. 2012).
[133] *L.D. v. UnitedHealthcare Ins.*, 684 F. Supp. 3d 1177, 1195 (D. Utah July 28, 2023) (quoting *LaAsmar*, 605 F.3d at 796).
[134] *M.S. v. Premera Blue Cross*, 553 F. Supp. 3d 1000, 1019 (D. Utah 2021).
[135] *Van Steen v. Life Ins. Co. of N. Am.*, 878 F.3d 994, 997 (10th Cir. 2018).
[136] *Graham v. Hartford Life & Acc. Ins. Co.*, 589 F.3d 1345, 1358 (10th Cir. 2009).
[137] *David P. v. United Healthcare Ins. Co.*, 77 F.4th 1293, 1308 (10th Cir. 2023) (quoting *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 382 (10th Cir. 1992).
[138] *David P.*, 77 F.4th at 1308.
[139] *Black & Decker*, 538 U.S. at 834.
[140] *David P.*, 77 F.4th at 1308.

as to why the administrator favored that evidence over the physician's evaluation.[141] However, an administrator also may not arbitrarily refuse to credit evidence that may confirm a beneficiary's theory of entitlement.[142] Thus, if a treating physician's evaluation confirms a claimant's theory of entitlement, an administrator may not arbitrarily refuse to "engage and address" such an evaluation.[143] "[R]eviewers cannot shut their eyes" to reliable evidence and ignore it.[144]

     Arbitrary and capricious review considers whether the decision had a reasoned basis that is supported by substantial evidence.[145] This includes whether the decision is "consistent with any prior interpretations by the plan administrator, is reasonable in light of any external standards, and is consistent with the purposes of the plan."[146] "Consistent with the purposes of the plan requirements means that a plan administrator acts arbitrarily and capriciously if the administrator 'fails to consistently apply the terms of an ERISA plan' or provides 'an interpretation inconsistent with the plan's unambiguous language.'"[147]

     The Plan "delegates to Cigna the discretionary authority to interpret and apply Plan terms and to make factual determinations in connection with its review of claims under the Plan," including the determination of whether a person is entitled to benefits under the Plan.[148] Therefore, the arbitrary and capricious standard of review applies.

---

[141] *Black & Decker*, 583 U.S. at 834. "This conclusion does not create any blanket requirement that a health plan administrator considering a claim for health care benefits must seek out all treating care givers' opinions found in a claimant's medical records and explain whether or not the plan administrator agrees with each of those opinions and why." *David P.*, 77 4th at 1312.

[142] *D.K.*, 67 F.4th at 1237 (quoting *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 807 (10th Cir. 2004)).

[143] *Id.* (citing *Black & Decker*, 583 U.S. at 834).

[144] *David P.* 77 F.4th at 131011.

[145] *D.K.*, 67 F.4th at 1236.

[146] *Id.*

[147] *Id.* (quoting *Tracy O. v. Anthem Blue Cross & Life Health Ins.*, 807 Fed. Appx. 845, 854 (10th Cir. 2020).

[148] AR 4133.

### B.     ERISA's Claim Processing Requirements

ERISA sets minimum requirements for employer-sponsored health plans, which may be administered by a third party.[149] "Administrators, like [Cigna], are analogous to trustees of common-law trusts and their benefit determinations constitute fiduciary acts."[150] Thus, administrators owe a special duty of loyalty to plan beneficiaries in determining benefit eligibility.[151]

"ERISA promotes the interests of plan participants and beneficiaries and contractually defined benefits 'in part by regulating the manner in which plans process benefits claims.'"[152] These standards constitute the minimum requirements for a plan's claims-processing procedure.[153] The procedure, set forth in 29 U.S.C. § 1133 and in related implementing regulations, require "a meaningful dialogue between ERISA plan administrators and their beneficiaries."[154] When administrators issue denial letters, they need to explain in clear language the reason(s) for their decision.[155] The Tenth Circuit has held that "the administrator must include its reasons for denying coverage in the four corners of the denial letter" because denial letters "play a particular role in ensuring full and fair review."[156] The purposes of ERISA's claim processing requirements "are undermined where plan administrators have available sufficient information to assert a basis for denial of benefits but choose to hold that basis in reserve rather

---

[149] 29 U.S.C. § 1001; *D.K.*, 67 F.4th at 1236.
[150] *D.K.*, 67 F.4th at 1236.
[151] *Id.* (quoting *Metro. Life Ins. V. Glenn*, 554 U.S. 105, 111 (2008)).
[152] *David P.*, 77 F.4th at 1299 (quoting *Black & Decker*, 538 U.S. at 830).
[153] *Id.*
[154] *Id.* at 1300.
[155] *D.K.*, 67 F.4th at 1239 (quoting *Booton v. Lockheed Medical Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997)).
[156] *Ian C. v. UnitedHealthcare Ins. Co.*, 87 F.4th 1207, 1219 (10th Cir. 2023).

than communicate it to the beneficiary."[157] Thus, when an administrator holds in reserve a basis for providing benefits, the administrator prevents a full and meaningful dialogue.[158]

"[I]f the plan administrators believe that more information is needed to make a reasoned decision, they must [clearly] ask for it," explaining why the information is needed.[159] If they deny benefits based on the text of the plan, they must cite to the specific provisions of the plan.[160] And if plan administrators deny benefits based on their scientific or clinical judgment of the claimant's circumstances, they must explain their reasoning as applied to the terms of the plan.[161]

Relatedly, ERISA sets out minimum requirements for the appeals procedure for members to challenge initial denial decisions.[162] A plan's review procedures must "'afford a reasonable opportunity to any participant whose claim for benefits has been denied [to receive] a full and fair review . . . .'"[163] ERISA's "full and fair review" creates a procedure by which claimants receive letters "knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of the evidence, and . . . having the decision-maker consider the evidence presented by both parties to reaching and rendering [its] decision."[164] This includes providing claimants an "opportunity to submit written comments, documents, records, and other information relating to the claim for benefits" as well as conducting a "review that takes into

---

[157] *David P.*, 77 F.4th at 1313.
[158] *Id.*
[159] *Id.* at 1300.
[160] *David P.*, 77 F.4th at 1299 (citing 29 C.F.R. § 2560.503-1(g)(1)).
[161] *Id.*
[162] 29 U.S.C. § 1132(2).
[163] *D.K.*, 67 F.4th at 1236 (quoting 29 U.S.C. § 1133).
[164] *Id.* (quoting *Sage v. Automation, Inc. Pension Plan & Tr.*, 845 F.2d 885, 893–94 (10th Cir. 1988)).

account all . . . information submitted by the claimant relating to the claim."[165] "[A]dministrator statements may not be conclusory and any health conclusions must be backed up with reasoning and citations to the record."[166]

The court turns to Plaintiffs' arguments regarding Cigna's alleged improper denial of benefits in violation of ERISA. Plaintiffs seek the recovery of benefits from July 1, 2019 through January 24, 2020.

### C.    Plaintiffs' Benefits Determination Arguments

Plaintiffs argue that Cigna failed to provide a "full and fair review" and engage in a meaningful dialogue in its appeals process.[167] Specifically, they allege that Cigna's claims processing was inadequate by failing to engage with F.R.'s medical history and treatment notes, as well as her letters of medical necessity.[168] Instead, according to Plaintiffs, Cigna's letters of denial were limited to conclusory statements without citation to the record.[169] Plaintiffs also argue that in addition to Cigna's procedural deficiencies, the record clearly demonstrates that F.R.'s treatment was medically necessary, such that F.R. is entitled to an award of benefits instead of remand.[170] The court treats each argument in order.

---

[165] *David P.*, 77 F.4th at 1299 (quoting 29 C.F.R. § 2560.503-1(h)(2)(ii), (iv)).
[166] *D.K.*, 67 F.4th at 1242 (citing *McMillan v. AT&T Umbrella Benefit Plan No. 1*, 746 F. App'x 697, 705–06 (10th Cir. 2018) (unpublished)); *see David P.*, 77 F.4th at 1312.
[167] Pls.' MSJ 17–22.
[168] *Id.*
[169] *Id.*
[170] *Id.* at 22–27.

### 1.     Failure to Address F.R.'s Medical History and Treatment Notes

Plaintiffs argue that Cigna's benefits denial letters concerning F.R.'s treatment at New

Haven repeatedly made conclusory statements in contradiction to F.R.'s medical history and

treatment notes.[171]

The initial denial letter dated August 2, 2019 concluded—without any explanation or

reference to the record—that

> There was no current risk of harm to yourself or others. You did not demonstrate
> a need for 24 hour/day monitoring and active treatment. Your family is involved
> in treatment. From the available clinical evidence, you could receive psychiatric
> treatment in a less restrictive setting. Less restrictive levels of care were
> available.[172]

This denial letter was conclusory and did not specifically reference any of F.R.'s medical

records[173] dated from July 1, 2019 to July 11, 2019 that it purported to review.[174] Additionally,

the reviewer's reference to family being involved in treatment as part of the denial reason is odd,

given that Cigna's Residential Treatment Guidelines require that family be involved to the best

of their ability in the treatment and discharge planning process.[175]

Moreover, Cigna made these statements despite available clinical information in early

July 2019, where, among other evidence, a treating therapist specifically concluded that F.R.'s

"symptoms and behaviors demonstrat[e] the continued need for RTC level of care.[176] Cigna did

---

[171] Pls.' MSJ 13, 20–21, 26–27.
[172] AR 4119–21.
[173] *See D.K.*, 67 F.4th at 1242 ("[Plan administrator's] failure to cite any facts in the medical record constituted conclusory reasoning and thus [Plan administrator] acted arbitrarily and capriciously.").
[174] The denial letter did not indicate which specific records Cigna reviewed other than "available clinical information." AR 4119; *see also* AR 3958 (New Haven attaching F.R.'s medical records from July 1, 2019 to July 11, 2019).
[175] AR 4226–27.
[176] AR 3341, 3980, 4018.

not have to defer to the opinion of F.R.'s treating therapist at New Haven, however, it could not arbitrarily refuse to consider it.[177]

Cigna's second denial letter, dated February 10, 2020,[178] marked an improvement, although it still suffered from many of the same defects as its prior letter:

> Based upon the available clinical information received initially and with this appeal, your symptoms did not meet Behavioral Health Medical Necessity Criteria for continued stay at the Residential Mental Health Treatment for Children and Adolescents level of care from 07/01/2019-07/01/2020 as the **treatment provided has led to sufficient improvement in the moderate to severe symptoms and/or behaviors that led to this admission so that you could be safely and effectively treated at a less restrictive level of care.** The clinical information described the **individual as being in behavioral control, presenting with a stable mood, actively engaging in programming and cooperative.** The **individual went on home passes and demonstrated their ability to maintain safety in this outpatient setting on multiple occasions**. The clinical information provided indicated that the **individual had not developed new symptoms and/or behaviors that required this intensity of service for safe and effective treatment**. Less restrictive levels of care were available for safe and effective treatment. (Emphasis added).[179]

Defendants argue that the bolded portions of the letter show that Cigna's reviewer did not "fail to respond" because the denial letter "specifically references the clinical information provided," such as F.R. being in behavioral control, presenting with a stable mood, actively engaging in programming and cooperative, going on successful home passes, demonstrating an ability to maintain safety, and developing no new symptoms and/or behaviors requiring this intensity of service.[180]

Although the letter does mention some specifics—primarily factual conclusions with no additional explanation—ERISA requires that an administrator's explanation of a clinical or

---

[177] *D.K.*, 67 F.4th at 1237.
[178] AR 3516–18.
[179] AR 3517.
[180] Defs.' MSJ Reply 3–6.

medical judgment "may not be conclusory and any health conclusions must be backed up with reasoning and citations to the record."[181] The explanation must also "apply[] the terms of the plan to the claimant's medical circumstances."[182]

On this record, Cigna's denial letters do not meet these minimum standards. After reviewing the denial letter, it still is unclear which "clinical information" Cigna used in making the determination. Granted, Cigna's reviewer stated earlier in the letter that he examined "available clinical information received initially and with this appeal."[183] However, this merely provides in conclusory fashion what records were examined—not which records supported Cigna's decision. More importantly, and critical to the court's determination here—Cigna failed to grapple with the specific facts that could have justified awarding benefits just as inadequately as it failed to address the medical opinions that may have justified the denial of benefits. The beneficiary and the court are left with no way of discerning the degree to which Cigna engaged with the record.

Specifically, the denial letter does not reference policy terms, does not specifically respond to any of the arguments F.R. made in her appeal, and fails to cite with specificity any of F.R.'s medical records, nor explain how those medical records applied to Cigna's denial rationale.[184] For example, nowhere in the denial letter does Cigna's reviewer respond to the opinion of F.R.'s treating therapist, who stated on multiple occasions in July 2019, August 2019, September 2019, October 2019, and November 2019 that F.R.'s "symptoms and behaviors

---

[181] *David P.*, 77 F.4th at 1312 (citing 29 C.F.R. § 2560.503-1(g)(1)(v)(B)).
[182] *Id.*
[183] AR 3517.
[184] AR 3516–18.

demonstrat[e] the continued need for RTC level of care."[185] Nor does Cigna's reviewer respond

to medical records that conflict with F.R. "presenting with a stable mood," such as treatment

summaries that indicated that F.R. suffered from "[b]ody image issues leading to some

restriction," hopelessness, and "occasional bursts" of suicidal ideation without intent or plan.[186]

Additionally, Cigna mentioned positive home pass experiences without referencing the "issues

that arose" and suffering from some "anxiety moments" on her November 2019 home pass,

which resulted in F.R.'s discharge being pushed back from December to January 2019.[187] In

short, Defendants failed to engage with the record.

Defendants attempt to distinguish the Tenth Circuit's recent decisions in *D.K. v. United*

*Behavioral Health*,[188] *David P. v. United Healthcare Insurance Company*,[189] and *Ian C. v.*

*UnitedHealthcare Insurance Company*.[190] First, Defendants argue that *D.K.* is "inapposite

because the fact-specific conclusions in *D.K.* regarding the administrative review process and

procedural errors in that case do not support a finding of abuse of discretion here"—namely that

the claim administrators in *D.K.* erroneously thought the plan excluded the type of treatment at

issue.[191] But as Plaintiffs point out, "Cigna fails to explain why *D.K.*'s central holding does not

apply to the denial letters in this case."[192] As noted in *Anne A. v. United Healthcare Ins. Co.*,[193]

> But the facts that distinguish this case from *D.K.* subtract nothing from its central
> holding: ERISA requires insurers to engage in a full and meaningful prelitigation
> dialogue regarding the denial of benefits, which must include actual explanation

---

[185] AR 1576, 2552, 2621, 2649, 2735, 2786, 2839, 2919, 2950, 3341, 3348, 3353, 3355, 3367, 3371.
[186] AR 3536.
[187] AR 3536.
[188] 67 F.4th 1224 (10th Cir. 2023).
[189] 77 F.4th 1293 (10th Cir. 2023).
[190] 87 F.4th 1207 (10th Cir. 2023); Defs.' MSJ 21–23.
[191] Defs.' MSJ 22.
[192] Pls.' Opp. to Defs.' MSJ 25, ECF No. 79, filed on April 3, 2024.
[193] No. 2:20-cv-00814-JNP-DAO, 2024 WL 1307168 (D. Utah Mar. 26, 2024).

of benefits denials that grapple with contrary evidence presented to the claims administrator, including treating physicians' opinions. *D.K.*, 67 F.4th at 1241. In this case, Defendants plainly failed to do so.[194]

Next, Defendants attempt to distinguish *David P.* and *Ian C.*[195] Defendants point out that in those cases, "the claim administrator did not address claimant's substance abuse treatment in the denial letters even though 'it was clear from the record . . . that [the RTCs] were each treating L.P. for substance abuse, in addition to providing mental health treatment.'"[196] In contrast, Defendants argue that in this case, "there is no evidence of any substance abuse concerns or treatment with respect to F.R."[197]

Again, this argument presents an unreasonably narrow view of the Tenth Circuit's holdings and simply reflects a difference in the specific facts. This difference does not subtract from the Tenth Circuit's reiteration that although a plan administrator "is not required to defer to the opinions of a treating physician," its reviewers cannot "arbitrarily refuse to credit such opinions" nor can they "shut their eyes to readily available information . . . [that may] confirm the beneficiary's theory of entitlement."[198]

### 2.      Failure to Engage with Medical Necessity Opinion Letters

In addition to F.R.'s medical history and records from her stay at New Haven, C.J. included in her appeal three letters of "medical necessity."[199] First, C.J. submitted a letter dated April 30, 2019 from Danella Hafeman, M.D., who treated F.R. from December 19, 2017 through

---

[194] *Id.* at *7 n.9
[195] Defs.' MSJ 23.
[196] *Id.*
[197] *Id.*
[198] *David P.*, 77 F.4th at 1310–11 (quoting *D.K.*, 67 F.4th at 1237); *Ian C.*, 87 F.4th at 1220.
[199] AR 903–09.

January 16, 2019.[200] Dr. Hafeman pointed to F.R.'s past diagnoses and treatment in IOP before

opining that F.R. "required an intense level of care beyond IOP that would provide the length of

time needed to clinically support her recovery."[201] Second, C.J. submitted a letter dated May 7,

2019 from a therapeutic/education consultant the family retained.[202] The consultant stated that

she "observed a young woman with severe, worsening depression who was immobilized by

anxiety and OCD, unable to attend school or leave home and prone to angry physical

outbursts."[203] She recommended F.R. receive treatment at New Haven.[204] Finally, C.J. submitted

a letter dated May 22, 2019 from Lisa DeCarolis, a licensed social worker, and Valerie Watson, a

special education teacher, both from the Pittsburgh Creative and Performing Arts school, where

F.R. was a student.[205] After discussing some of F.R.'s past treatment and the detrimental effect of

her symptoms on her ability to perform in school, the letter concluded that the writers were

"hopeful that with residential treatment she will get the 24 hour, therapeutic care that will allow

her to develop the skills that she will need to manage significant mental health issues and be able

to function as a student in our school again in the future."[206]

 Defendants make an array of arguments as to why these letters are not persuasive.[207]

First, they point out that all of these letters are dated over a month prior to July 1, 2019, the

beginning of the coverage period in question, and some of the treatments and observations of

---

[200] AR 904.
[201] *Id.*
[202] AR 906.
[203] *Id.*
[204] AR 907.
[205] AR 909.
[206] *Id.*
[207] Defs.' MSJ 18–19.

symptoms were provided months earlier.[208] Accordingly, the writers "could not have reviewed clinical information or opined on F.R.'s current needs or level of care as of July 1, 2019."[209] Second, Dr. Hafeman did not specifically opine that F.R. required an RTC level of care, given that partial hospitalization is an "intense level of care beyond IOP."[210] Third, Ms. Allen never treated F.R. and stated that F.R. was "progressing" at New Haven nearly two months prior to the treatment period in question.[211] And fourth, Ms. DeCarolis, LSW, and Ms. Watson are non-medical professionals and are thus not qualified to render an opinion on "medical necessity."[212]

Some of these arguments might well have merit. Defendants' failing, however, is that they provided none of these reasons in Cigna's second denial letter, which does not reference or discuss any of the letters.[213] Even if Defendants dismissed the letters from school personnel and the family's consultant as unhelpful to their medical necessity determination, the letter from Dr. Hafeman is a treater letter. Defendants did not necessarily have to defer to it, but they did have to engage with it. ERISA's procedural safeguards require "a meaningful dialogue between ERISA plan administrators and their beneficiaries."[214] Yet, Cigna's February 10, 2020 denial letter failed to engage with even the treater's letter, instead simply reiterating without explanation or citation to the record that "[l]ess restrictive levels of care were available for safe and effective treatment."[215] "It cannot be that the depth of an administrator's engagement with medical opinion

---

[208] *Id.*
[209] *Id.* at 19.
[210] *Id.* at 18.
[211] *Id.* at 18–19.
[212] *Id.* at 19 n.3.
[213] *See* AR 3517.
[214] *David P.*, 77 F.4th at 1300.
[215] AR 3517.

would be revealed only when the record is presented for litigation."[216] Cigna's claims processing here was not a "full and fair review" of F.R.'s record, nor did Cigna provide F.R.'s parents with a "meaningful dialogue." Accordingly, Defendants' denial of coverage was arbitrary and capricious.

### D.    Remand for Further Consideration

Having determined that Cigna acted arbitrarily and capriciously when it failed to comply with ERISA's claims processing requirements, the court must decide whether to remand for the plan administrator's "renewed evaluation of the claimant's case" or to award benefits.[217] This decision "hinges on the nature of the flaws in the administrator's decision."[218] Typically, "remand is appropriate if the administrator failed to make adequate factual findings or failed to adequately explain the grounds for the decision."[219] "But if the evidence in the record clearly shows that the claimant is entitled to benefits, an order awarding such benefits is appropriate."[220] If the record contains both evidence supporting Plaintiffs' claims for benefits and evidence supporting the denial of benefits, it cannot be said that the record "clearly shows" that the claimant is entitled to benefits.[221]

If benefits are not awarded, remand is proper. A remand, however, "does not provide the plan administrator the opportunity to reevaluate a claim based on a rationale not raised in the

---

[216] *D.K.*, 67 F.4th at 1241.

[217] *Weber v. GE Grp. Life Assur. Co.*, 541 F.3d 1002, 1015 (10th Cir. 2008) (quoting *Flinders*, 491 F.3d at 1193).

[218] *Carlile v. Reliance Standard Life Ins.*, 988 F.3d 1217, 1229 (10th Cir. 2021).

[219] *David P.*, 77 F.4th at 1315 (cleaned up); *see id.* (citing *Spradley v. Owens-Illinois Hourly Emps. Welfare Ben. Plan*, 686 F.3d 1135, 1142 (10th Cir. 2012)) ("[R]emand is more appropriate where plan administrator failed to make adequate factual findings or failed to explain adequately the grounds for its decision to deny benefits, but not if the administrator instead gave reasons that were incorrect"); *Buffonge v. Prudential Ins. Co. of Am.*, 426 F.3d 20, 31 (1st Cir. 2005) (concluding remand as the proper remedy when the "problem is with the integrity of [the plan administrator]'s decision-making process").

[220] *David P.*, 77 F.4th at 1315 (cleaned up).

[221] *David P.*, 77 F.4th at 1314 n.17.

administrative record, and not previously conveyed to plaintiffs."[222] Thus, in evaluating whether

Cigna's interpretation of the Plan was "reasonable and in good faith," the court reviews only

those rationales that are in the administrative record and conveyed to Plaintiffs. The court now

turns to whether the "record clearly shows" that coverage is warranted from July 1, 2019 to

January 24, 2020.

Here, Cigna did not provide F.R. a "full and fair review."[223] It rejected, without

meaningful explanation or record support, Plaintiffs' arguments that F.R.'s treatment was

medically necessary based on, for example, F.R.'s prior medical history, her medical necessity

letters, and her New Haven medical records. But the court cannot conclude that the "'record

clearly shows' Plaintiffs are entitled to benefits, nor can [it] say that Plaintiffs are clearly not

entitled to the claimed benefits."[224]

For example, F.R.'s treatment notes between July 1, 2019 and January 8, 2020 illustrate

positive progress, such as F.R. "showing great positivity and self esteem right now," losing "a lot

of anxiety she had that has been holding her back," and "[m]aking great progress

therapeutically."[225] But her therapist also opined that F.R.'s "symptoms and behaviors

demonstrat[e] the continued need for RTC level of care"[226] and that F.R. has "no [suicidal

ideation] now but [has] 'occasional bursts' without intent or plan."[227] Further, as discussed

*supra*, F.R.'s July 3, 2019 self-questionnaire displayed mixed results.[228]

---

[222] *David P.*, 77 F.4th at 1315.
[223] 29 U.S.C. § 1133(2).
[224] *David P.*, 77 F.4th at 1315.
[225] AR 3980, 3536.
[226] AR 1576, 2552, 2621, 2649, 2735, 2786, 2839, 2919, 2950, 3341, 3348, 3353, 3355, 3367, 3371.
[227] AR 3536.
[228] AR 4020–35.

Remand is thus the proper remedy. The court declines to award benefits for F.R.'s stay at New Haven because, having reviewed the evidence, the court cannot say the "record clearly shows" coverage is warranted.

## II.      MHPAEA (Parity Act) Claims

Plaintiffs additionally claim that Defendants violated MHPAEA by misapplying medical necessity requirements in favor of Cigna's own guidelines in its denial letters and having additional requirements for mental health coverage that do not apply in comparable medical or surgical care.[229] "Congress enacted [MHPAEA] to end discrimination in the provision of insurance coverage for mental health and substance use disorders as compared to coverage for medical and surgical conditions in employer-sponsored group health plans."[230] A "comparison of treatment limitations under MHPAEA must be between mental health/substance abuse and medical/surgical care 'in the same classification.'"[231] For example, "if a plan or issuer classifies care in skilled nursing facilities or rehabilitation hospitals as inpatient benefits, then the plan or issuer must likewise treat any covered care in residential treatment facilities for mental health or substance user disorders as an inpatient benefit."[232] But the plans need not have identical coverage criteria so long as the application of nonquantitative treatment limitation to mental health or substance use disorder benefits in the classification are comparable to, and are applied

---

[229] Pls.' MSJ 29–35.
[230] *Michael D. v. Anthem Health Plans of Ky., Inc.*, 369 F. Supp. 3d 1159, 1174 (D. Utah 2019) (quoting *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 356 (2d Cir. 2016)).
[231] *Peter M. v. Aetna Health & Life Ins. Co.*, 554 F. Supp. 3d 1216, 1226–27 (D. Utah 2021) (quoting 29 C.F.R. § 2590.712(c)(4)(i), 2(ii)(A)).
[232] *Robert B. v. Premera Blue Cross*, 701 F. Supp. 3d 1153, 1182 (D. Utah 2023).

no more stringently than, those used in applying the limitation with respect to medical/surgical benefits.[233]

As discussed in *Theo M. v. Beacon Health Options*, 631 F. Supp. 3d 1087 (D. Utah 2022), because the court has concluded that remand is the appropriate remedy for the denial of Plaintiffs' benefits, the MHPAEA claim is moot.[234] Similar to *Theo M.*, Plaintiffs here argue that "F.R. may well need to seek benefits from the Plan in the future,"[235] despite Defendants pointing out that they no longer employ the guidelines at issue in this case.[236] But the court cannot decide the MHPAEA claim "on the possibility of a future denial of benefits."[237] Accordingly, the court does not reach the issue of whether Defendants violated MHPAEA.

## ORDER

Accordingly, the court GRANTS IN PART Plaintiffs' motion and DENIES Defendants' motions. The court REMANDS the benefits determination from July 1, 2019 to January 24, 2020 to Defendants for further review of Plaintiffs' benefits claim consistent with this Memorandum Decision and Order. The court does not address the parties' cross-motions for summary judgment on the MHPAEA claim because this order has rendered the issue moot.

---

[233] *Id.* (citing 29 C.F.R. § 2590.712(c)(4)(i)).

[234] *Id.* at 1110–11 (citing *David P. v. United Healthcare Ins. Co.*, 564 F. Supp. 3d 1100, 1123 (D. Utah 2021), *aff'd in part, vacated in part, rev'd in part*, 77 F.4th 1293 (10th Cir. 2023)); *see also Michael D. v. Anthem Health Plans of Kentucky, Inc.*, 369 F. Supp. 3d 1159, 1176 (D. Utah 2019) (declining to reach a ruling on the MHPAEA claim after finding exclusion of benefits arbitrary and capricious).

[235] Pls.' MSJ 38.

[236] Defs.' MSJ 12 n.2.

[237] *M.A. v. United Healthcare Ins.*, No. 1:21-cv-00083-JNP-DBP, 2023 WL 6318091, at *10 (D. Utah Sept. 28, 2023) (citing *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 580–81 (1985)).

Signed September 24, 2024.

BY THE COURT

_____
David Barlow
United States District Judge